# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

OJ COMMERCE, LLC, a Delaware
limited liability company

      Plaintiff/Counter-
Defendant,

  vs.

TRAFFIC TECH, INC., a California
Corporation

      Defendant/Counter-
Claimant.

Case No. 2:24-cv-01407-SK

**SUMMARY ADJUDICATION
ORDER**

OJ Commerce, LLC ("OJC") is an e-commerce company that sells
consumer goods—primarily furniture and household items—through online
marketplaces, including Amazon.  In mid-2023, as OJC's business was
growing rapidly, it needed more warehousing capacity than its existing
provider, World Depot, could supply.  (Weiss Depo. at 120:13–121:9).  OJC
found Traffic Tech, Inc. ("TT"), a commercial warehousing and logistics
provider operating a multi-client facility with over 200,000 square feet of
capacity in the Los Angeles area.  (Siqueiros Depo. at 60:2–63:13).

The parties entered a Warehousing Agreement (the "Agreement")
under which TT would receive, store, and ship OJC's goods.  (ECF 78-2).
The Agreement was detailed: it defined a "Standard of Care" for TT's
performance of certain services, allocated risk through a layered set of
limitation-of-liability provisions in Section 8, established termination rights

in Section 13, and included a Quotation with pricing and volume projections.  The Agreement was negotiated by sophisticated commercial parties—both represented by counsel—and the redline history reflects genuine give-and-take on material terms, including the scope of the consequential-damages exclusion. (Hawkins Depo. at 32:13–33:11; ECF 208, 210-1, 210-2).

But the relationship only lasted roughly four to five months over the 2023-2024 winter holiday season.  By both sides' accounts, it was troubled from the start: plagued by operational friction, scope disputes, volume disagreements, and escalating mutual recrimination.  (ECF 208).  OJC claims TT misrepresented its capabilities to induce OJC to sign the Agreement.  TT claims OJC overloaded containers, refused to negotiate pricing adjustments, and then manufactured a pretext for termination.  The relationship ended in early 2024.

OJC now claims approximately $6.1 million in damages across seven categories—ranging from chargebacks on specific orders to lost future sales from Amazon marketplace suspensions.  TT counterclaims for unpaid invoices on services rendered during the relationship, as well as approximately $3 million in alleged lost profits over the remaining term of the Agreement.  Both sides demand a jury trial.  But both also pursue legal theories—OJC through a fraudulent inducement claim, TT through an implied covenant claim—that go beyond the four corners of the contract they negotiated.

What's more, although both profess to be ready for trial, their inability to agree on a coherent verdict form, substantive jury instructions, or even basic exhibit and witness lists exposes why they are not: there are

2

antecedent legal questions that must be resolved before a jury can be empaneled.  A verdict form cannot be drafted without knowing which claims survive.  Jury instructions on fraud damages cannot be written without knowing the applicable measure.  The consequential-damages exclusion cannot be submitted to the jury without a ruling on which contractual provisions are conditioned on the Standard of Care.  These are not trivial questions the Court has manufactured to narrow the case or delay trial.  They are questions the parties' own pretrial submissions demonstrate must be answered first—because without those answers, there is no legally sound way to submit this case to a jury.

To that end, the Court's first pretrial conference order identified five critical legal questions for summary adjudication under Rules 16(c)(2) and 56 of the Federal Rules of Civil Procedure.  (ECF 203).  The standard for summary adjudication is the same as for summary judgment.  *See Norcal Gold, Inc. v. Laubly*, 543 F. Supp. 2d 1132, 1135–36 (E.D. Cal. 2008); *San Francisco Baykeeper v. Levin Enterprises, Inc.*, 12 F. Supp. 3d 1208, 1215 (N.D. Cal. 2013).  But since all discovery has closed, the parties could and did brief these questions based on the existing factual record.  (ECF 209–12).  Having now reviewed those briefs—as well as the Agreement and negotiation redlines (ECF 210-1, 210-2), the Joint Memorandum of Damages Facts (ECF 208), the proposed agreed and disputed jury instructions (ECF 191, 192), and pertinent deposition testimony cited by the parties—the Court rules as follows.[1]

---

[1] The Court addresses the five questions identified in the pretrial conference order in the following sequence: Questions 1 and 2 (Section I), Question 3 (Section II), Question 4 (Section III.A), and Question 5 (Section III.B and III.C).

## I.    SECTION 8 LIMITATIONS OF LIABILITY

The "parties may agree by their contract to the limitation of their liability in the event of a breach." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1040, 1048 (C.D. Cal. 2003) (citing *Markborough Cal., Inc. v. Superior Court*, 227 Cal. App. 3d 705, 714 (1991)). What the parties agreed to here thus constrains the scope of OJC's recoverable damages—and explains why OJC clings to its fraud claim. So the place to start is Section 8 of the Agreement, understanding that "the construction of a contract is always a matter of law for the court, no matter how ambiguous or uncertain or difficult its terms, and that the jury can only assist the court by determining disputed questions of fact." *O'Connor v. West Sacramento Co.,* 189 Cal. 7, 18 (1922).

### A. The Standard of Care Framework

Section 8 creates a layered risk-allocation system. The critical structural feature is that some provisions condition their protections on TT's compliance with the "Standard of Care"—defined in Section 2.3 as the degree of care exercised by "a reasonably careful warehouseman . . . under like circumstances"—while others do not. Six provisions are relevant here.[2]

Three in the Agreement are expressly conditioned on the Standard of Care and share an apparent common feature: each addresses a phase of TT's duties as physical custodian of OJC's stored goods. Start with Section 8.1 (first clause), which reads in pertinent part: "The Warehouseman shall not be liable for any loss or damage or deterioration to the Stored Goods for

---

[2] Section 8.5, governing liability for loss or damage to goods in storage, needs no discussion—the parties agree no such claims are at issue. (ECF 208).

any cause whatsoever unless such damage or loss resulted from [the] Warehouseman's failure to perform the services in accordance with the Standard of Care and the damage could have been avoided by the exercise of such care." Read carefully, this provision is not necessarily the universal master switch or defensive chokepoint that either party conceives it to be.

For its part, OJC argues that because the first clause of Section 8.1 conditions liability on the Standard of Care, *all* the following Section 8 provisions must be read through that lens, including ones—like Section 8.7 (shipping errors) and 8.4(iii) (barring consequential damages)—that appear unconditional. Under this reading, TT gets the benefit of the limitation-of-liability provisions *only* when TT performs carefully. When TT is negligent, all the contractual caps, limits, and exclusions fall away under OJC's theory, permitting it to recover everything—including its largest categories of special damages for lost future sales. (ECF 209 at 2–3). TT, on the other hand, treats Section 8.1 as the first wall of its tiered defenses—arguing that the Standard of Care threshold described in that opening section means OJC must first prove negligence by TT before it can recover anything. But even then, TT maintains, the other Section 8 provisions—especially Section 8.4(iii)—create more walls, independently capping or barring specific categories of damages even when TT is found negligent. (ECF 210 at 5–7).

Read more naturally, Section 8.1 (first clause) says it is limited by its own terms to a specific category of harm: physical "loss or damage or deterioration to the Stored Goods." That sounds like classic bailment risks—a forklift crushing a couch, water damage to inventory, goods lost in the warehouse. The Standard of Care would be a natural fit for those risks to stored goods because the question is whether TT took adequate physical

care of goods in its custody.  That reading is reinforced by both the second and third pertinent provisions in the Agreement also conditioned on the Standard of Care.  Section 8.4(i) bars liability for damage from certain enumerated perils (fire, flood, acts of God)—another set of bailment risks.  And Section 8.8 provides that TT "shall not be responsible for delays in loading" so long as it satisfies the Standard of Care—again, a physical-custody function.

The three unconditional provisions, by contrast, seemingly address a fundamentally different operational phase: logistics and fulfillment.  Section 8.7 governs "errors in the shipment of the Goods"—sending the right box to the wrong address, duplicate shipments, mislabeled packages—and caps damages for such errors.  Section 8.1 (second clause—the penalties provision) bars liability for "penalties, financial or otherwise, that may exist in contracts between [OJC] and any of [OJC's] customers."  And critically, Section 8.4(iii) bars liability for "any indirect loss, consequential damages, or special damages, including loss of profit, loss of business, loss of business opportunities . . . for any reason whatsoever."  None of these provisions is conditioned on the Standard of Care.  And none necessarily needs to be, for if the Standard of Care is calibrated to the physical care of stored goods, it would be an awkward fit for logistics errors.  A couch shipped to the wrong address, for instance, isn't generally "damaged or deteriorated"—it's misrouted.  The parties evidently addressed that risk not with a negligence standard but with a hard financial cap instead.

But even if Section 8.1 were read—singly or in context—the way OJC prefers (not as confined to bailment risks but as an umbrella provision), that construction still cannot add legal standards to later provisions that

possess no such conditional Standard of Care language.  The textual contrast between the two sets of provisions at issue (those expressly conditioned on Standard of Care and those not) is not merely inescapable—it is purposeful.  The drafters evidently mapped different liability standards onto different provisions.  When the parties wanted to condition a limitation on the Standard of Care, they said so.  When they did not, they used sweeping, unqualified language—"in no circumstances," "for any reason whatsoever," "under any circumstances."  Courts do not read conditions into provisions where the same instrument shows the drafters knew how to include one.  *See Silverbrand v. County of Los Angeles*, 46 Cal. 4th 106, 126 (2009).

Hewing to that rule of contract interpretation for Section 8.1 would not lead to absurd results when applying the other sections, as OJC suggests.  (ECF 209 at 2–3).  Under OJC's broadest reading, Section 8.1 can mean what it says: if TT meets the Standard of Care, it has zero liability for any loss.  But if TT doesn't meet the Standard of Care, the shield drops and TT is potentially liable.  Even so, the amount of damages for that exposed liability is then governed by other applicable Section 8 provisions.  So even if OJC is right that this first clause operates as sort of a master switch, it generally covers "everything" only in the sense that it provides blanket immunity when TT is careful.  If TT fails that standard, Section 8.1's blanket protection lifts, leaving the other provisions in Section 8 to do their work on their own terms—which may include limiting *how much* TT owes (if anything) for specified types of losses.  That parsimonious interpretation of Section 8.1 would give effect to all terms in the Agreement without importing a negligence standard into provisions that lack such a condition.

*See* Cal. Civ. Code § 1641.  So construed, the Agreement's layered risk allocation becomes plain: TT's compliance with the Standard of Care is a condition to enforcing Sections 8.1 (first clause), 8.4(i), and 8.8.  And it is *not* a condition to enforcing Sections 8.4(iii), 8.1 (penalties clause), or 8.7.

### B. "Loss of Profit" Is Not a Standalone Exclusion

Having established which provisions are conditioned and which are not, the Court must resolve one more interpretive question about Section 8.4(iii).  TT contends that the phrase "including loss of profit" acts as an independent exclusion barring all lost-profit claims—whether direct or consequential.  If TT is right, the Standard of Care framework is largely academic, because even direct lost profits would be barred.  But TT is wrong—and the undisputed negotiation history confirms what the text of Section 8.4(iii) says.  *See Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968).

An early version of the Agreement drafted by TT excluded liability for "direct or indirect loss."  During negotiations, OJC objected, and TT agreed to remove "direct."  TT's own redline comment confirmed its understanding of what was being removed by stressing what remained: "We cannot accept to be liable for indirect damages." (Hawkins Depo. at 32:13–33:11; ECF 210-2; *see* ECF 208).  The final executed Agreement thus bars only "indirect loss, consequential damages, or special damages, including loss of profit. . . ."  The word "including" here introduces illustrative examples of the preceding barred categories; it does not create a freestanding prohibition.  *See JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 660 F. Supp. 3d 840, 848 (N.D. Cal. 2022); *Coremetrics, Inc. v. AtomicPark.com, LLC*, 2005 WL 3310093, at \*4 (N.D. Cal. Dec. 7, 2005).

Compare that with the contract in *Clean Safety, Inc. v. HNC Enters., LLC*, 2023 WL 9019060 (C.D. Cal. 2023), where the clause used "LOST PROFITS OR REVENUES" as a separately enumerated item parallel to "CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL" damages— suggesting a standalone exclusion for all lost profits. *Id.* at *5. Here, by contrast, Section 8.4(iii) uses "including loss of profit" in the same sentence as an illustrative subset of the preceding categories. In that position, it clarifies that lost profits—which might otherwise be debated as direct or indirect—fall within the exclusion only when they are indirect, consequential, or special damages. Illustrative examples in limitation clauses routinely serve this clarifying purpose without creating independent prohibitions. *See, e.g.*, *JH Kelly*, 660 F. Supp. 3d at 848 (treating "including" as illustrative in similar clause).

Otherwise, if "including loss of profit" categorically barred all lost profits regardless of classification, the parties' negotiated deletion of "direct" was pointless. Negotiated deletions can thus carry interpretive weight since sophisticated commercial parties presumably don't expend effort to remove a specific word for no reason. Courts, in turn, generally give the deletion operative effect rather than interpret surrounding language to smuggle the deleted concept back in. *See Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003). Here, though, the negotiation history is not clarifying an ambiguity in the text of the contract. Instead, the negotiated deletion of "direct" just confirms what Section 8.4(iii) unambiguously says on its face: it bars indirect and consequential lost profits only.

9

**C. What OJC Can Recover Under the Negotiated Agreement**

With Section 8's framework established, the Court now applies it to each of OJC's seven claimed damages categories. (ECF 208).[3]

**Categories A & B** (Specific-Order Chargebacks and Refunds: $598,075). OJC seeks $411,969 in chargebacks and refunds for late shipments and $186,106 for items never shipped. OJC argues these are direct damages—the immediate economic consequence of TT's failure to ship specific, identified customer orders (at all or on time)—and thus exempt from Section 8.4(iii). TT argues they are consequential damages barred by Section 8.4(iii). That dispute is more nuanced than the parties seemingly recognize. There is the threshold legal distinction between direct and indirect damages (often distinguished as general versus special damages), which is not for a jury to decide. But there is also the classification question—do Categories A and B qualify as "direct" damages—which presents a narrow fact question that a jury must decide under the correct legal instructions.

First, the law. Direct (or general) damages are the "natural and necessary consequence of a contract breach," and because their occurrence is sufficiently predictable, the parties are "deemed to have contemplated

---

[3] While it doesn't assert them as a category of damages per se, OJC contends that TT billed $106,103 in storage fees in violation of Section 2.3 (applying minimum fees immediately rather than after the first 60 days) and $437,177.50 in accessorial charges (stretch wrap, labeling, extra labor, pallet supply) without the "prior written consent" required by Section 4.3. TT's corporate representative evidently admitted at deposition that no written consent was obtained, creating a genuine dispute of material fact. (Hawkins Depo. at 143:14–17 (pallets), 145:15–19 (labor), 157:11–19 (wrap), 158:24–159:7 (labeling)). So even though OJC has abandoned its affirmative claim for restitution of these amounts (ECF 209 at 3), these claims survive as a defensive offset against TT's demand for unpaid invoices—and the jury must be instructed accordingly.

them" at the time of contracting. *Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. District*, 34 Cal. 4th 960, 968 (2004). Critically, though, general damages are "based on the value of the performance itself, not on the value of some consequence that performance may produce." *Id.* at 971. On the other hand, consequential (or special) damages are losses that "do not arise directly and inevitably from any similar breach of any similar agreement." *Id.* at 968. Instead, they are "secondary or derivative losses arising from circumstances that are particular to the contract or to the parties." *Id.* They do not emerge naturally and directly from the breach but from some special circumstance or condition. *See id.* at 968–70.

Second, the facts. Construed in its favor, OJC's theory—that a refund or chargeback resulting from a specific unshipped or late order is the natural and inevitable consequence of non- or late-shipment under the Agreement—is reasonable because it distinguishes between lost profits "on the contract itself" and lost profits from "future or unidentified contracts." *Id.* at 970–71. TT's corporate representative reinforced this plausible distinction, testifying that if TT "damaged [a specific] couch, and [they] couldn't deliver it, that would be an example of a direct damage." (Hawkins Depo. at 35:23–36:14). That presents a genuine dispute of material fact. So under default legal rules as summarized in *Lewis Jorge*, whether a particular chargeback or refund claimed by OJC is the natural and inevitable consequence of a late or missed shipment—or instead just a consequential loss mediated by a third party's intervening decision—is a factual question for the jury to answer with correct instructions on the law.[4]

---

[4] Perhaps these categories could be legally parsed more—treating Category A

**Categories C & D** (Incorrect and Duplicate Shipments: $85,757). These categories involve shipping errors—goods sent to the wrong address, duplicate shipments, and the like.  Section 8.7 governs "errors in the shipment of the Goods" and caps liability at "the transportation costs to be incurred to rectify any such error."  When it applies, this provision categorically excludes "liability for damages due to the acceptance or use of said Goods."  This language is unambiguous and unconditional.  So OJC may recover verified freight and transportation costs to correct each shipping error—nothing more.  OJC's attempt to recover the replacement value of lost merchandise is foreclosed by Section 8.7's plain text.

Still, OJC argues that Section 8.7, like Section 8.1, must be construed as conditioned on the Standard of Care.  (ECF 209 at 2–3).  But that argument misreads Section 8.1's scope if the first clause means what it says and seemingly applies only to "loss or damage or deterioration to the *Stored* Goods."  Section 8.7, by contrast, applies to "errors in the shipment of the Goods"—operational mistakes in the logistics chain.  By that reading, these provisions do not overlap because they are directed at different risks in different operational phases.  It is hard to describe a shipping error that sends an undamaged couch to the wrong address as "loss or damage or

---

(late-shipped items resulting in chargebacks) as consequential while treating Category B (unshipped items resulting in refunds) as direct.  But construing the evidence in OJC's favor, the Court should let the jury determine the classification of both.  To be clear, though, the question sent to the jury here—whether a specific refund or chargeback was the natural and inevitable consequence of late or failed shipments—is about the causal mechanism of individual consumer transactions, something that the Court cannot resolve by summary adjudication.  It is not the same question—discussed later in Section II of this order—as whether OJC's aggregate claimed losses were proximately caused by fraud rather than by breach, a legal question the Court can resolve because the undisputed record leaves no room for reasonable disagreement.

deterioration to the *Stored* Goods"—but it is natural to describe it as an error "in the shipment of the Goods."  Under that restrained reading of Section 8.1 (first clause), then, there is no implied Standard of Care condition to read into Section 8.7 because Section 8.1's Standard of Care condition was never designed to govern shipping errors in the first place.

Even if Section 8.1 applied more broadly, as OJC argues, that would still provide no basis to import a Standard of Care condition to Section 8.7 when it has no such express language.  In OJC's view, Section 8.7 otherwise "makes no sense." (ECF 209 at 2–3).  Not so: there is a consonant interpretation that lets both provisions work together, even under OJC's broadest reading of Section 8.1.  Section 8.1 provides zero liability when TT *does* meet the Standard of Care.  Section 8.7 then governs what happens when TT *fails* to meet that standard with regard to shipping errors— capping the recoverable damages for negligent shipping.  Section 8.1's first clause is thus a threshold provision—a complete defense when TT performs carefully, but silent on the measure of damages when TT does not.  If Section 8.7 also applied only when TT met the Standard of Care (as OJC contends), it would be redundant of Section 8.1, which (under OJC's reading) already provides zero liability in that scenario.  Section 8.1 is a shield (zero liability when TT isn't negligent) while Section 8.7 is a cap (limited liability when TT is negligent).  Reading Section 8.7 as OJC wants—as also being independently conditioned on the Standard of Care— would render it surplusage in light of OJC's own reading of Section 8.1, a result disfavored by California law.[5]  *See* Cal. Civ. Code § 1641.

---

[5] Because its claimed losses in Categories C and D will be capped at minor

**Category E** (Inventory Removal Costs: $36,500).  OJC claims as damages the costs of removing its inventory from TT's warehouse on termination of the Agreement, arguing these were extraordinary expenses caused by TT's breach rather than the ordinary post-termination costs contemplated by Section 13.  The argument has some force: if TT's failures forced an emergency relocation, the incremental cost above normal termination expenses might plausibly qualify as direct damages.  But even on this more generous reading, the costs fall within Section 8.4(iii)'s explicit exclusion of "cost and expenses in providing or securing substitute revenues or substitute service providers."  Relocating inventory to a substitute warehouse is the classic example of the category this provision was designed to exclude.  Moreover, Section 13 places the obligation on OJC anyway to "arrange to . . . transport the Goods away from the Facility" upon termination—so OJC would have borne relocation costs no matter how the relationship ended.  Unlike Categories A and B—where the direct/consequential classification is genuinely disputed and depends on the jury's assessment of specific orders—the classification of inventory relocation costs in Category E doesn't depend on disputed facts.  It depends only on the plain text of the contract, which bars these damages by operation of Sections 8.4(iii) and 13.

**Categories F & G** (Marketplace Suspensions and Post-Relationship Lost Sales: $5,466,359).  These are the largest categories by far—and the most consequential, in both the legal and colloquial senses of the word.

---

transportation/freight costs, whether these claimed damages merit full-blown jury consideration is questionable.

Category F ($2,043,949) represents OJC's lost sales from Amazon account suspensions during the relationship.  Category G ($3,422,410) represents lost sales and the economic value of reputational harm after the relationship ended.  But as the category descriptions themselves reveal, both depend on the intervening decisions of third parties or consumer dynamics—Amazon's decision to suspend OJC's seller account, and the marketplace's reaction to OJC's reputational decline.  They are thus paradigmatic consequential losses barred by Section 8.4(iii).  OJC's counterarguments cannot change that.

First, as to the Amazon account suspensions, OJC argues that because Appendix A to the Agreement specifically contemplated Amazon fulfillment metrics, these losses were foreseeable and therefore "direct."  (ECF 209 at 5–6).  But foreseeability makes consequential damages recoverable—it does not reclassify them as direct.  *See Lewis Jorge*, 34 Cal. 4th at 969–70.  Consequential damages (to repeat) are losses that do not arise naturally and directly from the breach, but only as a consequence of some special circumstance or condition.  *See id.* at 968–70.  The chain of events here—from TT's shipping errors, to Amazon's suspension algorithm, to OJC's account deactivation, to lost future sales via Amazon—is precisely the kind of attenuated, third-party-dependent causal chain that leads to consequential damages.  The direct damage from shipping errors is the cost of the error itself, but the Amazon suspension is one step removed—it requires Amazon to exercise independent judgment about whether to penalize OJC for the shipping errors.[6]

---

[6] That does not mean, of course, that such consequential damages can never be

15

Second, OJC tries to rely on a so-called "reseller exception" identified
in *Lewis Jorge*.  As explained in that case, profits lost "on the contract
itself"—meaning the value of the performance the breaching party failed to
deliver—are general (direct) damages.  *Lewis Jorge*, 34 Cal. 4th at 970.  But
profits lost on "future or unidentified contracts"—meaning collateral
business opportunities that evaporated because of the breach—are special
(consequential) damages.  *Id.* at 971.  Even so, *Lewis Jorge* recognized
three unique situations where lost profits on collateral transactions might
qualify as general damages: "when the contract involves crops, goods
intended for resale, or an agreement creating an exclusive sales agency."
*Id.* at 971–72.  In these situations, "the likelihood of lost profits from
related or derivative transactions is so obvious . . . that the breaching party
must be deemed to have contemplated them at the inception of the
contract."  *Id.* at 972.  It is the second exception—"goods intended for
resale"—that OJC contends applies here.

But even if this resale exception applies to services contracts—a
premise TT disputes (ECF 212 at 4–5) and which the Court need not
resolve—the exception still cannot rescue Categories F and G.  The resale
exception makes lost profits on identified resale transactions direct
damages because those profits are the "direct and immediate fruits of the
contract."  *Lewis Jorge*, 34 Cal. 4th at 971.  It does not make all foreseeable
downstream losses direct.  Marketplace suspensions, reputational harm,

---

recovered; it just means that is a function of the parties' contract.  But as the text of
Section 8.4(iii) in the Agreement here makes plain—reinforced by TT's refusal "to be
liable for indirect damages" (Hawkins Depo. at 32:13–33:11)—that is not the agreement
the parties, with aid of counsel, made here.

and future lost sales still depend on intervening third-party decisions—Amazon's algorithm, consumer reactions to OJC's seller metrics—that are not part of any identified resale transaction.  The resale exception, in other words, addresses the predictability of lost profits on specific goods that were supposed to be resold.  It does not address the unpredictability of third-party platform penalties triggered by a chain of events one or more steps removed from the breach.

To the extent the reseller exception has any relevance here, it reinforces why Categories A and B go to the jury: whether a refund or a chargeback is the direct fruit of a late or unshipped order turns on facts like specific marketplace rules, whether chargebacks were automatic or discretionary, how each transaction was processed, and the like.  Did the customer automatically get a refund because the order never shipped (making the refund a direct loss—the natural and inevitable consequence of non-shipment), or did the customer exercise independent judgment in causing a credit card chargeback (possibly making it a consequential loss)?  But that is where the exception's work ends.

For Categories F and G, there is no comparable factual dispute about the causal mechanism for the loss.  The causal chain is undisputed: TT's shipping errors → Amazon's suspension algorithm → account deactivation → lost sales.  The question isn't whether Amazon exercised independent intervening judgment—no one can deny that it did.  Amazon decided whether to suspend, how long to suspend, and when to reinstate.  And the marketplace—imbued with so many intervening micro-third-party decisions causing a macro-economic effect—decided how to react to OJC's

reputational decline.  No factual finding can change the structure or logic of those causal chains.  That is why OJC doesn't—and can't—contend that the Amazon suspensions and the company's loss of goodwill were automatic or inevitable; it can argue only that they were foreseeable.  And if foreseeability were the dispositive question, it would be one for the jury to decide.

But again, foreseeability of a loss cannot change the nature of the loss: whether it is general because it flows "directly and necessarily from the breach" or it is consequential because it arises from "circumstances that are particular to the contract or to the parties." *Lewis Jorge*, 34 Cal. 4th at 969–70.  In other words, as *Lewis Jorge* makes clear, foreseeability determines only whether consequential damages are recoverable, not whether they are reclassified as direct.  *Id*. at 968–69.  Because the undisputed causal structure of the damages in Categories F and G includes intervening and independent judgments of third parties, no rational jury applying the correct legal standard could classify these losses as direct damages.  They are consequential as a matter of law—and thus barred from recovery by Section 8.4(iii) of the Agreement.  *See In re Circle K Corp.*, 98 F.3d 484, 486 (9th Cir. 1996) ("Although contract interpretation involves mixed questions of law and fact, the application of contractual principles is a matter of law.").

## II.   OJC'S FRAUDULENT INDUCEMENT CLAIM

The contract OJC negotiated—with its layered limitation-of-liability provisions—reduces OJC's potential recovery from $6.1 million to at most the $598,075 in Categories A and B (if the jury classifies them as direct

damages), plus verified freight/transportation costs for Categories C and D, and a residual unauthorized-charges offset against TT's unpaid-invoices counterclaim.  That is the unavoidable damages landscape within which OJC's fraud claim must be evaluated—and it explains why OJC fights so hard to keep that claim alive.  If the fraud claim survives, California Civil Code § 1668 voids the contractual limitations the Court has just applied, theoretically restoring the full $6.1 million, because § 1668 exempts fraud claims from limitation-of-liability clauses by operation of law.  But that is only the beginning of the analysis, not the end.  Section 1668 does not—and cannot—create fraud damages where none exist.  And OJC admits it has none.  (ECF 208 at 3).

In other words, OJC's fraud claim falls by summary adjudication—not because OJC lacks a cognizable theory of fraud or evidence of material misrepresentations by TT—but because the only damages OJC seeks are contract damages that OJC just declares to be fraud damages too.  (ECF 208 at 3).  It concedes, then, that it has no fraud damages independent of its contract damages.  So what § 1668 seemingly gives OJC with one hand is given away by OJC with the other.  But to understand why this is invariably the case, the Court must explain—in the three analytical steps that follow— where both TT and OJC stray from established contract and tort principles.

### A. The Fraud Claim Survives Affirmation of the Contract

To start, contrary to TT's contention, OJC has not waived its fraud claim by electing to affirm the contract.  *See Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 20 (2024); *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 989 (2004).  A party fraudulently induced into a contract may either rescind and seek restitution, or affirm and sue for damages in both

contract and tort. *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). OJC chose the latter path. That choice was legally permissible; indeed, it was OJC's only practical option because OJC—having paid TT nothing—has no restitution damages. (ECF 208 at 3).

But contrary to what OJC thinks, the election of remedies permitted by affirming the contract does not collapse the distinction between tort and contract damages under California law. A plaintiff who affirms a fraudulently induced contract may indeed pursue both claims—but it must still prove each claim's damages independently according to tort and contract law. Even damages for fraudulent inducement must be measured not by what the plaintiff expected to gain from performance of the contract (it was wrongly induced into entering), but by what the plaintiff lost through entering the (wrongly induced) contract. *See Lazar*, 12 Cal. 4th at 649; *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995); *Stout v. Turney*, 22 Cal. 3d 718, 725 (1978). Otherwise, there would be no point to the rule against double recovery of tort and contract compensatory damages. *See Tavaglione v. Billings*, 4 Cal. 4th 1150, 1159 (1993).

But if OJC admits it lost nothing merely by entering the contract—having paid TT zero dollars—why does it insist on maintaining its fraudulent inducement claim? Because that is the surest—and for OJC, the only—way under California law to escape the limitation-of-liability provisions in the contract that OJC chose to affirm. On this much, the parties agree: Civil Code § 1668 voids contractual limitations on liability for fraud. *See New England Country Foods, LLC v. VanLaw Food Prods., Inc.*, 17 Cal. 5th 703, 717 (2025). That is (presumably) why TT conceded the point—twice. In its motion in limine briefing, TT acknowledged that the

20

limitation-of-liability provisions "would only apply to OJC's non-fraud claims." (ECF 158-1 at 7 n.3). And in the agreed jury instructions, the parties jointly submitted CACI No. 1923—the out-of-pocket fraud damages instruction—which would be unnecessary if the Agreement barred all fraud damages. (ECF 191 at 59). While TT now tries to reverse these correct concessions (ECF 210 at 7–8), the reversal must be rejected because there is no denying that § 1668 applies to fraud claims.

## B. Section 1668 Does Not Change Fraud Damages

That TT conceded this point about Civil Code § 1668, however, does not end the inquiry. The Court must be precise about what § 1668 does and does not do. Section 1668 removes the contractual cap on damages for fraud. It does not—and cannot—reengineer or rewrite the tort measure of damages for fraud. Even after § 1668 voids any contractual limitations as applied to OJC's fraud claim as such, OJC must still prove recoverable fraud damages under tort law. After all, § 1668 "does not preclude parties from limiting their liability for pure breaches of contract absent a violation of an independent duty that falls within the ambit of section 1668." *New England Country Foods*, 17 Cal. 5th at 717. So a contract may serve as both a shield and a sword, but losing the contract shield does not create a tort sword. "Reading section 1668 to encompass intentional breaches of contract"—what OJC does in effect—"would erode fundamental distinctions between contract law, which is meant to enforce promises of individual parties, and tort law, which is meant to vindicate social policy." *Id.*

Stripped of its fraud veneer, OJC's claim for damages originates in "nothing more than a breach of . . . contractual obligations" by TT. *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1125

21

(2012).  Every major dollar OJC seeks—chargebacks, refunds, lost sales from marketplace suspensions or reputational harm—is measured by the economic performance OJC expected to achieve had TT performed as promised.  That is the hornbook definition of benefit-of-the-bargain contract damages.  *See, e.g.*, *Tavaglione*, 4 Cal. 4th at 1159.  But benefit-of-the-bargain damages do not become fraud damages just because the contract was fraudulently induced.  That is why the Court directed OJC to "distinguish[] or explain[] as needed between amounts claimed as fraud damages from contract damages."  (ECF 203 at 1).  Its response was a single sentence: "OJC's position is that all its breach of contract damages are also recoverable as fraudulent inducement damages."  (ECF 208 at 3).

That is not a distinction; it is a concession—and it gives away the store.  OJC was given notice and opportunity to identify fraud-specific reliance damages—e.g., integration costs, transport costs to move goods to TT's facility, system setup expenditures, or any other amount spent in reliance on TT's alleged fraudulent representations.  OJC identified nothing.  OJC admits it paid TT zero dollars.  Yet none of that matters— according to OJC—because somehow its fraudulent-inducement claim is boundlessly free of any distinction between tort and contract damages.  But that contention flies in the face of California law.  *See*, *e.g.*, *Kelley v. Fundomate, Inc.*, 773 F. Supp. 3d 899, 926 (C.D. Cal. 2025) (collecting cases holding benefit-of-the-bargain damages unrecoverable on fraud claims under California law); *S. Union Co. v. Sw. Gas Corp.*, 180 F. Supp. 2d 1021, 1038 (D. Ariz. 2002) (applying California law; damages theory premised on what plaintiff "would have" earned constitutes unrecoverable benefit-of-the-bargain damages).

## C. OJC Cannot Prevail If Its Fraud Damages Are Zero

So if OJC has no fraud damages, how can it pursue—much less prevail—on a claim for fraudulent inducement?  OJC takes three swings at that argument, and misses each time.

OJC's lead argument is that Civil Code § 3333, which both sides agree applies here, provides that a tort plaintiff may recover "all the detriment proximately caused" by the tort.  From this, OJC reasons that because the fraud induced the contract, and the breached contract produced the losses, the fraud "proximately caused" every detriment—including the loss of its benefit of the bargain.  (ECF 209 at 9–10).  But this logic chain has a broken link—it collapses proximate causation into but-for causation, or just outright confuses the two.  Proximate cause requires more than a "but-for" connection between the wrong and the harm; it requires that the harm be a foreseeable and direct result of the wrong itself—not of some independent intervening act.  *See Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 968–69 (1997).  The alleged fraud may have been the but-for cause of OJC entering the Agreement—and thus the but-for cause of every downstream event including expectancy damages.  But the proximate cause of those losses is TT's alleged failure to perform its contractual duties—an independent intervening act of nonperformance.  Civil Code § 3333 does not—and cannot—transform but-for causation into proximate causation.  If it did, every breach of a fraudulently induced contract would automatically generate unlimited tort damages—a result the California Supreme Court has squarely rejected.  *See Simon v. San Paolo U.S. Holding Co.*, 35 Cal. 4th 1159, 1176 (2005) ("Fraudulent promises . . . may cause the [affected party] to expend money in reliance, but they do not themselves cause the

23

losses" when the "injury is instead caused by the [other party's] breach of
an enforceable contractual obligation . . . .").

A simple counterfactual proves the point.  If TT had lied about its
capabilities but then performed flawlessly, OJC's claimed damages would
be zero—no matter the fraud.  On the other hand, if TT had told the
complete truth but still performed poorly, OJC's claimed loss would be the
same $6.1 million in contract damages it wants now.  In either scenario, the
loss—or lack of loss—tracks contract performance, not the truth of pre-
contract representations.  So the proximate cause of OJC's claimed losses is
breach of contract, not fraudulent inducement.  *See Gray v. Don Miller &
Assocs., Inc.*, 35 Cal. 3d 498, 504 (1984) (fraud damages reversed where
loss resulted from seller's refusal to proceed with sale, not from
misrepresentation itself).

To be clear, justifiable reliance is different than proximate causation.
OJC may well have justifiably relied on TT's alleged misrepresentations in
deciding to enter the Agreement.  That is an element of the fraud claim it
would have to prove, and the Court does not resolve it here.  But justifiable
reliance on a misrepresentation that induces a contract is not the same
thing as proximate causation of losses that result from the other party's
subsequent failure to perform.  A plaintiff who relied on a lie in signing a
contract has a fraud claim.  But the fraud damages on that claim are limited
to what the plaintiff lost by signing—not expanded to what the plaintiff
didn't gain because the other side didn't perform.  The California Supreme
Court drew exactly this line in *Lazar*: the plaintiff could recover "the
expense and disruption of moving" and "loss of security and income
associated with former employment"—costs of entering the transaction—

but had to "rely on his contract claim for recovery of any loss of income allegedly caused by wrongful termination"—costs of nonperformance. 12 Cal. 4th at 646, 649. OJC has identified no equivalent reliance costs. It paid TT nothing.

The implications of OJC's contrary position must not be overlooked. If accepted, it would mean that in *every* breach of a fraudulently induced contract, the defrauded party could recover the full measure of its expectancy damages in tort—free of any contractual limitations, caps, or exclusions—simply by alleging that the breaching party lied about its ability to perform (or had no intention of performing). Every contractor who overpromised and underdelivered would face not just a breach claim subject to the contract's risk allocation, but a parallel tort claim for the same damages with no contractual ceiling. The careful risk allocation that sophisticated parties negotiate—the very kind of allocation in Section 8 of the Agreement here—would thus be rendered meaningless. California law does not permit this result, and for good reason: it would blur if not erase the established distinction between tort and contract remedies. *See Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 693–94 (1988); *see also Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 97 (1995) (discussing the "purposefully different measures of damages" in tort and contract).

OJC's "lock-in" variant of this argument fares no better. OJC implies it was trapped in the contract during the holiday season rush. (ECF 209 at 8). But that just means the lock-in effect of the holiday season may have prevented OJC from mitigating its losses. It cannot mean that inability to

escape a harm is the proximate cause of that harm.[7]  The losses or harms during the lock-in period—chargebacks, refunds, marketplace suspensions—were caused by TT's failure to perform, not by OJC's inability to leave.  Again, if TT had performed flawlessly during the holiday season, OJC would have suffered zero losses despite being locked in by TT's alleged fraud.  Otherwise, OJC has never quantified any cost attributable to the lock-in itself—such as the incremental cost of an emergency transition to a substitute provider—as distinct from the losses caused by TT's breach.

It is no answer to say that proximate cause is conventionally a jury question.  When, as here, a party's concession (ECF 208 at 3) establishes ultimately that every claimed category of loss tracks performance—and no claimed loss tracks reliance—proximate causation effectively becomes a legal issue, not a genuinely disputed fact question.  *See Mattco Forge, Inc. v. Arthur Young & Co.*, 52 Cal. App. 4th 820, 840 (1997) (proximate cause may be decided as matter of law where reasonable minds cannot differ on evidence).  No rational jury could find that such losses were proximately caused by reliance on pre-contractual misrepresentations rather than simply by post-contractual nonperformance.  And OJC's concession is compelled anyway by the undisputed record: it paid TT nothing (ECF 210 at 6–7 n.3), it identified no reliance expenditure when

---

[7] It is genuinely disputed anyway whether OJC could not avoid the harm.  OJC's principal testified that the alleged fraud became "apparent" within the first week of TT's performance.  (Weiss Decl. ¶ 42, ECF 92).  Yet OJC continued to perform for several months.  If what OJC's principal said is true—which, to be clear, the Court need not and cannot decide now—losses incurred after discovering TT's misrepresented capabilities could not have been proximately caused by pre-contractual reliance.  *See Lazar*, 12 Cal. 4th at 648–49; *Stout*, 22 Cal. 3d at 725; *see also Shapiro v. Sutherland*, 64 Cal. App. 4th 1534, 1549 (1998).

the Court gave it the chance to do so (ECF 203; ECF 208 at 3), and each category of claimed damages it finally enumerated with specificity (ECF 203; ECF 208) is measured by what OJC expected to gain from TT's performance on the bargain they struck in the Agreement.  The claimed damages are thus defined by the gap between promised and actual performance—the textbook definition of contract damages.  Faced with those facts, no rational jury could find that losses which would be zero if TT performed well (regardless of the fraud) but $6.1 million if TT performed poorly (regardless of the truth) were "proximately" caused by fraud rather than breach.

OJC's second argument is that because "the entering of the contract *is* the tortious harm," there is no meaningful distinction between fraud damages and contract damages in an inducement case.  (ECF 209 at 10).  To be sure, a fraudulent inducement claim *is* conceptually separate from a breach of contract claim.  The case OJC cites—*Dhital v. Nissan N. Am., Inc.*, 84 Cal. App. 5th 828, 838 (2022)—reiterates that uncontroversial premise.  But OJC draws the wrong conclusion from that premise.  A separate tort produces separate damages, too.  *Dhital* held only that the economic loss rule did not bar the fraud claim there; it said nothing about allowing a fraud plaintiff with no fraud damages to recover instead the expectancy damages available on the contract claim—merely by renaming the contract damages fraud damages.  At bottom, then, OJC seeks to erase a line that the California Supreme Court has firmly drawn: the tort of inducement causes entry into the contract (and the reliance losses that follow from that entry), while the breach of contract represents the failure to perform (which leads to the expectancy losses that follow from that nonperformance).  *See Lazar*,

27

12 Cal. 4th at 645, 649.  A plaintiff—like OJC—may try to pursue both claims, but the damages on each claim are still measured differently.  The double-recovery rule OJC itself recognizes—from *Lazar*, 12 Cal. 4th at 638—exists precisely because tort and contract damages are distinct.  If they were always identical or subsumed each other like OJC imagines, the rule would be unnecessary.

The conclusion is no different under a promissory fraud theory of inducement.  As relevant here, a promise made with no intent to perform is analytically identical to a misrepresentation about capability to perform—the damages still flow from contractual nonperformance, not from the false promise itself.  *Lazar* addressed exactly this scenario (an employer's false promise of continued employment) and held that the employee "must rely on his contract claim for recovery of any loss of income."  12 Cal. 4th at 649.  *Simon* is on point too.  There, the plaintiff's out-of-pocket loss was $5,000.  His claimed expectancy loss was $400,000.  The court held the $400,000 was caused by the failure to close the deal, not by the fraud.  35 Cal. 4th at 1178–79.  Here, OJC's out-of-pocket loss is zero.  Its claimed expectancy loss is $6.1 million.  If *Simon*'s $400,000 contract loss was too remote from the $5,000 fraud, OJC's $6.1 million gap is not merely remote—it is in a different universe.

OJC's attempts to distinguish these and other controlling California Supreme Court authorities are equally unavailing.  On *Lazar*, OJC cites the passage allowing causes of action "in tort as an alternative at least, and perhaps in some instances in addition to" contract.  12 Cal. 4th at 638 (quoting Restatement (Second) of Torts § 530(1) cmt. c).  True enough—but OJC omits the sentence that applied this principle: "Lazar must rely on his

28

contract claim for recovery of any loss of income allegedly caused by wrongful termination of his employment." *Id.* at 649.  On *Simon*, OJC argues the case is distinguishable because "there was no enforceable contract." (ECF 209 at 10).  But *Simon*'s significance is its rejection of the same misunderstanding OJC has here—"that fraud plaintiffs generally may recover benefit-of-bargain as well as out-of-pocket damages" just because they claim to have been fraudulently induced into entering a contract.  35 Cal. 4th at 1176 n.4.  And on *Gray*, OJC argues it is distinguishable because there was a "causation issue" not present here.  (ECF 209 at 11).  But OJC has precisely the same causation issue: in *Gray*, the loss was caused by the seller's refusal to proceed; here, the loss is caused by TT's failure to perform.  In every way that matters, the analytical structure is identical.

For its third and last argument, perhaps finally seeing these insurmountable legal flaws in its fraud damages theory, OJC pivots in its opposition brief to recharacterize its contract expectancy damages as fraud reliance damages.  (ECF 211 at 3–4).  Chargebacks, refunds, and shipping costs—OJC now says—are "out-of-pocket" losses because they represent "amounts actually paid."  This profoundly misunderstands out-of-pocket reliance damages caused by fraud.  It does not mean "any money a plaintiff spent."  It means the difference between what the defrauded party gave to the defendant and what it received from the defendant at the time of the transaction.  *See Stout*, 22 Cal. 3d at 725; *Alliance Mortg.*, 10 Cal. 4th at 1240; *see also Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1032 (9th Cir. 1999) ("Usually, out-of-pocket damages are calculated as of the time of the transaction").  Refunds OJC paid to its customers, shipping costs OJC incurred to remediate TT's errors, and revenue OJC lost from

marketplace suspensions are all losses that track TT's contract nonperformance. They are the expected fruits of a broken contract—not the out-of-pocket costs of entering that contract.

If nothing else, OJC's own agreed jury instruction confirms the point. In Agreed Instruction No. 47 (ECF 191 at 59), tracking CACI No. 1923, the parties jointly proposed instructing the jury that fraud damages equal "the fair market value of what [plaintiff] gave" minus "the fair market value of what [it] received." OJC cannot submit an instruction correctly embodying the out-of-pocket rule for fraud damages and simultaneously argue that its claimed $6.1 million damages—despite being nothing other than contract damages—are recoverable as dressed-up, self-declared fraud damages.

\* \* \*

Because OJC has no compensatory fraud damages, partial summary judgment must be granted in TT's favor on OJC's fraudulent inducement claim. That claim is thus eliminated from the jury trial.[8] Two more consequences follow. First, OJC's demand for punitive damages on the fraud claim fails. Punitive damages are available only "in addition to" actual damages. Cal. Civ. Code § 3294(a). Where there are no compensatory damages, there is nothing to augment. *See Kizer v. County of San Mateo*, 53 Cal. 3d 139, 147 (1991) ("[A]ctual damages are an absolute predicate for an award of exemplary or punitive damages."). Second, OJC cannot assert fraud as an affirmative defense to offset TT's

---

[8] Given this outcome, TT's attempt to revive the economic loss doctrine as an independent bar need not be addressed. Besides, the Court denied summary judgment on that ground before (ECF 100), and nothing in the pretrial conference order invited its reopening.

breach of contract counterclaim.  This is not because its election to affirm the contract categorically prohibits a fraud defense, as TT implies.  It is because OJC's recoverable fraud damages are zero—leaving nothing to offset against TT's counterclaim.  A defense predicated on an offset of zero is no defense at all.

## III.   TT'S COUNTERCLAIMS

The Court has held OJC to the contract it signed—enforcing Section 8's limitations even where the result forecloses OJC's largest damages categories.  The same principle—and similar doctrinal discipline—now applies to TT.  TT's counterclaim has two components.  The first—unpaid invoices for services TT rendered before the relationship ended—proceeds to trial subject to OJC's unauthorized-charges offset (as noted in footnote 3 above).  The second—approximately $3 million in lost profits for the remaining contract term—is the main subject of the analysis that follows.

### A. The Implied Covenant Claim Is Superfluous

TT asserts a counterclaim for breach of the implied covenant of good faith and fair dealing alongside its breach of contract counterclaim.  Under California law, the implied covenant is a contract doctrine, not a tort doctrine (outside the insurance context).  *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 516 (1994).  Its remedies are limited to contract damages.  *See Foley*, 47 Cal. 3d at 699.  So where an implied covenant claim "[does] not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek[s] the same damages," it is superfluous.  *See Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990); *Bionghi v. Metro. Water*

*Dist. of S. Cal.*, 70 Cal. App. 4th 1358, 1370 (1999).

TT contends that OJC engaged in bad-faith conduct—deliberately overloading containers, refusing to negotiate pricing adjustments, and invoking the resulting chaos as a pretext for termination under Section 13. (ECF 212 at 6–7). Sometimes such allegations can sustain an implied covenant claim alongside a breach claim. *See, e.g., Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 112 Cal. App. 5th 519, 556 (2025). But *Oakland Bulk* and its ilk are distinguishable: in those cases, the implied covenant claim almost invariably yielded remedies unavailable through the breach claim. Here, TT seeks the same damages on both claims—including lost profits for the remaining term of the contract. TT has identified no remedy its implied covenant claim provides that its breach claim does not. That is the hallmark of *Careau* superfluousness.

Even if it were a close call, the implied covenant claim cannot go to the jury on the current record because it would create a significant risk of juror confusion and inconsistent verdicts. *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349–50 (2000); *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 372 (1992). As it stands now on the verdict form the parties have proposed, the claim ostensibly presents the jury with two parallel paths to damages—including TT's demand for $3 million—on identical facts. But one would be subject to the Section 13 termination framework and the other potentially untethered from it. That has all the makings of an erroneous damages award.

On the other hand, eliminating this claim doesn't make TT's evidence disappear. Every fact TT would present for the implied covenant claim— the bad-faith conduct, the container-overloading theory, the pretext-for-

32

termination narrative—remains admissible through TT's breach of contract counterclaim and its affirmative defenses of prevention, waiver, and excuse of performance. The jury will hear this evidence. If the jury agrees, for instance, that OJC's bad faith means it did not satisfy Section 13's conditions for termination, TT's recovery will not be capped. What TT may not do, though, is present the same evidence through a separate duplicative claim. Eliminating it only streamlines the trial and protects the verdict from post-trial attack. It does not diminish TT's substantive rights by a single dollar.

### B. The 180-Day Cap Cannot Be Applied as a Matter of Law

Section 13 of the Agreement permits termination upon 180 days' written notice if "the parties do not reach a mutual agreement about new pricing required by (1) material changes in the scope of work not contemplated by this Agreement." Under *Martin v. U-Haul Co. of Fresno*, 204 Cal. App. 3d 396, 409 (1988), where a contract is terminable upon notice, the non-breaching party's expectation damages may be capped at the notice period—because the breaching party could have terminated lawfully. *Cf. Sierra Wine & Liquor Co. v. Heublein, Inc.*, 626 F.2d 129, 132 (9th Cir. 1980). But whether the *Martin* cap applies here turns on whether Section 13's conditions were satisfied. And whether those conditions were met is a genuinely disputed fact question.

The jury must decide, in other words, whether there was: (1) a material change in scope, and (2) a failure to reach mutual agreement on new pricing. For its part, OJC argues that TT's own counterclaim allegations—that OJC "dramatically increased" SKUs per container beyond the Agreement's assumptions (ECF 20 at ¶¶ 15, 31–32, 50)—constitute

33

judicial admissions satisfying the first prong. *See Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226–27 (9th Cir. 1988). But even if the first prong is met, the second—whether the parties ever engaged in good-faith pricing negotiations—is still genuinely disputed. Because both conditions must be satisfied, and the second undeniably still turns on disputed facts, the 180-day cap cannot be applied as a matter of law until after the jury decides whether the antecedent conditions for termination under Section 13 were met.

### C. Evidentiary Sufficiency on TT's Claim for Lost Profits

That the applicability of the 180-day cap depends on a jury question says nothing about whether TT has sufficient evidence to reach the jury on its lost-profits counterclaim in the first place. The Court has an independent obligation to ensure that claims proceeding to trial rest on evidence sufficient to permit a rational jury to find in the claimant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Just as OJC's fraud claim fails because it concession (no fraud damages) leaves no triable issue, TT's lost-profits claim may fail because of an evidentiary gap that may likewise warrant summary judgment in OJC's favor.

TT's theory is seemingly straightforward: OJC wrongfully terminated a three-year contract; had it been performed, TT would have earned approximately $3 million over those three years; and TT was ready, willing, and able to perform its end of the bargain. (ECF 210 at 13–14; ECF 212 at 5–7). As a result, TT argues that its entitlement to lost profits follows naturally from any wrongful termination of a fixed-term contract, that the contract price and volume projections in the Quotation are enough for a jury to compute damages, and that the "reasonable certainty" standard is a

jury question. (*Id.*). But that syllogism is marred by glaring deficiencies.

To be sure, the notion that lost profits are inherent in any wrongful termination has doctrinal support. *See Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal. 4th 747, 774 (2012). And the "reasonable certainty" standard is indeed ordinarily one that a jury could apply to a set of damages facts. But zero certainty is not reasonable certainty; the standard requires evidence on both the *fact* of damage and the *amount*. *See Lewis Jorge*, 34 Cal. 4th at 975; *GHK Assocs. v. Mayer Grp., Inc.*, 224 Cal. App. 3d 856, 873 (1990). On the current record, while it has proclaimed the amount, TT points to no evidence suggesting it has established a reliable baseline for the fact of damage in the form of lost profits. If the Quotation in the Agreement is all that TT has, that evidence just reveals what TT would have *charged*; it says nothing about what TT would have *earned* after costs. Besides, the Agreement was in effect for four to five months—a period plagued by operational friction and scope disputes. (ECF 208). TT has not identified a single month of normal profitable operations that could anchor a three-year projection. *See Sargon*, 55 Cal. 4th at 774 (lost-profit projections must be grounded in reliable data, not speculation or conjecture); *Food Safety Net Servs.*, 209 Cal. App. 4th at 1132 ("Damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.").

Nor does TT's $3 million figure appear anywhere in an expert report—indeed, TT has disavowed the need for an expert. But for a contract with only a few months of contentious history, expert testimony is not a luxury. A lay jury cannot project multi-year revenue streams, subtract variable and fixed costs, and arrive at a net-profit figure without guidance.

*See Parlour Enters., Inc. v. Kirin Grp., Inc.*, 152 Cal. App. 4th 281, 290–91 (2007) (affirming exclusion of lost-profits evidence where plaintiff offered no expert and relied on "speculative" revenue projections).  Besides, even if TT could prove lost revenue, California law limits recovery to *net* profits.  *See* Cal. Civ. Code § 3358 ("No person can recover a greater amount in damages for the breach of an obligation, than he could have gained by the full performance thereof on both sides.").  Yet TT has offered no evidence—of which the Court is aware—separating gross revenue from the costs of performance.  A figure that doesn't account for costs is a measure of revenue, not a reasonably certain figure representing lost net profits.

Finally, and not least, TT must contend with OJC's mitigation defense, which both parties agree goes to the jury.  (ECF 191 at 57) (using Ninth Circuit Model Civil Jury Instruction § 5.3).  TT operates a 200,000-square-foot multi-client facility.  (Siqueiros Depo. 60:2–63:13).  If TT cannot demonstrate reasonable efforts to fill that capacity over the remaining contract term, OJC's mitigation defense may substantially reduce—if not eliminate—TT's recovery.  *See Agam v. Gavra*, 236 Cal. App. 4th 91, 111 (2015).

* * *

For all these reasons, partial summary judgment must be granted in OJC's favor on TT's implied covenant counterclaim.  The claim is eliminated from the jury trial without prejudice to the introduction of relevant bad-faith evidence through TT's breach of contract claim and affirmative defenses.  The Court defers partial summary judgment, however, on TT's lost-profits counterclaim until the March 18, 2026 conference.  Because the evidentiary deficiencies identified above are

serious—and all discovery (fact or expert) is now closed—the Court must determine whether there is enough evidence for a rational jury to award $3 million in lost profits on the state of the current factual record. *See* Fed. R. Civ. P. 16(c)(2)(C), (I).

Thus, TT must be prepared to show at the March 18 hearing: (a) the specific evidence it will present to establish lost net profits with reasonable certainty; (b) a computation separating gross revenue, variable costs, fixed cost allocations, and resulting net profit for each year of the claimed period that a jury could receive; and (c) why no replacement revenue was earned during the remaining contract term, or what replacement revenue was earned but still left TT in the red for $3 million.

## IV.  CONCLUSION

In sum, the Court orders:

1.    Section 8's limitation-of-liability provisions is ADJUDICATED enforceable as follows: Sections 8.1 (first clause), 8.4(i), and 8.8 are conditioned on TT's compliance with the Standard of Care, whereas Sections 8.4(iii), 8.1 (penalties clause), and 8.7 are not.  The term "loss of profit" in Section 8.4(iii) is not a standalone exclusion that bars direct lost profits.  As a result, Categories F, G, and E of OJC's claimed damages are barred; Categories C and D may be capped by Section 8.7; and whether Categories A and B constitute direct or consequential damages is a jury question.

2.    Partial summary judgment is GRANTED in TT's favor on OJC's fraudulent inducement claim.  OJC has no compensable fraud damages independent of its contract damages.  The fraud claim, the derivative

punitive damages demand, and any fraud-based offset defense are thus eliminated from the jury trial.

3.      Partial summary judgment is GRANTED in OJC's favor on TT's implied covenant counterclaim.  The claim is eliminated from the jury trial without prejudice to TT's presentation of the same relevant evidence it intends to offer anyway through its breach of contract counterclaim and affirmative defenses.

4.      Partial summary judgment is DEFERRED on TT's lost-profits portion of its counterclaim.  If TT has adduced enough evidence to permit a rational jury to find in its favor on both the fact and amount of lost net profits, the follow-on question—whether Section 13's conditions for termination were satisfied, triggering the 180-day damages cap—must be resolved by the jury.

* * *

As previously scheduled, a further pretrial status conference will be held via Zoom at **10 AM PT** on **March 18, 2026**.  The parties shall be prepared to set a trial date and set deadlines for final pretrial documents consistent with this order—including a special verdict form, substantive jury instructions, joint exhibit and witness lists, and a proposed final pretrial conference order.  The court will also entertain TT's evidentiary proffer on its lost-profits counterclaim at the same time.[9]

---

[9] The following ancillary matters are confirmed for post-trial or post-judgment adjudication: First, OJC's false advertising claim under California law will be decided by the Court, *see Nationwide Biweekly Admin., Inc. v. Superior Ct.*, 9 Cal. 5th 279, 322 (2020), if there is anything left to decide given the elimination of its fraud claim and absent any claimed restitution.  Second, despite TT's contrary recommendation made without the benefit of this order, the equitable defenses of estoppel and unclean hands—

IT IS SO ORDERED.


Dated: March 16, 2026

_____
STEVE KIM
United States Magistrate Judge

---

if they too remain relevant and ripe—will be decided by the Court after the jury verdict. *See Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir. 1996).  Third, TT's indemnification claim for attorney fees under Section 10 of the Agreement—along with any other claim for attorney fees available under California law (*e.g.*, Cal. Civ. Code § 1717 or Cal. Bus. & Prof. Code § 17082)—will be decided by post-judgment motions depending on which side prevails and on what terms.