# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| OJ COMMERCE, LLC, a Delaware limited liability company<br><br>        Plaintiff/Counter-Defendant,<br><br>    vs.<br><br>TRAFFIC TECH, INC., a California Corporation<br><br>        Defendant/Counter-Claimant. | Case No. 2:24-cv-01407-SK<br><br>**ORDER DENYING REQUEST BY OJ COMMERCE, LLC FOR RECONSIDERATION IN PART OF SUMMARY ADJUDICATION ORDER** |

OJ Commerce, LLC (OJC) is an e-commerce retailer.  Because it has no warehousing or shipping infrastructure of its own, it contracted with Traffic Tech, Inc. (TT) for those services.  As it turned out, TT failed to ship some orders correctly or on time, which (among other consequences) caused OJC's seller accounts on Amazon and other online marketplaces to be suspended.  For a retailer that sells exclusively online, losing access to Amazon hurts the bottom line.  So OJC sued TT for breach of contract, claiming for damages (as relevant here) around $6 million in profits lost because of the sales that couldn't happen when their Amazon (and other) marketplace accounts were suspended as a result of TT's alleged breach.[1]

---

[1] Though it doesn't matter to the outcome, OJC's loss figure for this damages category appears overstated especially when parsing its total lost profits—between existing and future sales—in the way it claims makes a legal difference between fraud and contract

But the parties' contract included limitations on liability—including a negotiated exclusion of consequential damages—if TT failed to perform as promised.  And as confirmed by the Court's summary adjudication order, OJC's claimed future lost sales from online marketplace suspensions are consequential damages excluded by the contract limits on liability.  So OJC needed another legal theory if it wanted to recover those damages barred by the contract.  It argued before—and tries to re-argue again—that its fraudulent inducement claim provides that legal theory of recovery.  But its supplemental arguments are just repackaged variations of ones already rejected.  In the end, its arguments come from two directions but aim at the same dead end: getting the claimed future lost profits barred by contract out from under that contract.  California law is not on OJC's side.

First, OJC argues that California Civil Code § 1668—which voids contract provisions that exempt a party from responsibility for its own fraud—lifts the consequential-damages bar not just against OJC's fraud claim (which everyone agrees it does) but also against its breach-of-contract claim on the premise that the contract was fraudulently induced. But California law doesn't countenance that end-run around contractual limitations on liability—and the California Supreme Court reinforced that understanding just last year.  Second, as fallback, OJC argues that even if the contract limits hold for its contract claim, the claimed lost profits can be recovered as tort damages instead—what OJC recasts as "reliance-based

---

damages.  Based on the Court's summary adjudication order, OJC's claimed damages for its unfulfilled future sales from suspended accounts is closer to $5.46 million.  (ECF 215 at 14–15) (outlining damages categories F and G for lost sales from marketplaces suspensions).

lost profit damages" compensable under California Civil Code § 3333, the general tort recovery statute.  But that argument confuses what reliance damages from fraud are and when they can be recovered as the proximate cause of that tort.

### A. California Civil Code § 1668 Applies Only to OJC's Fraud Claim—It Does Not Void the Contract Limits to OJC's Consequential Damages

Start with § 1668.  The statute says that "[a]ll contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud . . . are against the policy of the law."  Cal. Civ. Code § 1668.  OJC emphasizes the breadth of that language—"all contracts"—and reasons that because TT procured the liability limitation (like the overall contract itself) through fraud, enforcing it on any claim would "directly or indirectly" exempt TT from the consequences of its own fraud.  But the California Supreme Court just last year addressed that proposed reading in *New England Country Foods, LLC v. VanLaw Food Products, Inc.* ("*NECF*"), 17 Cal. 5th 703 (2025)—and rejected it.

Section 1668 "does not preclude parties from limiting their liability for pure breaches of contract absent a violation of an independent duty that falls within the ambit of section 1668."  *Id.* at 717.  "Where the claims asserted are 'nothing more than a breach of . . . contractual obligations,' section 1668 does not apply."  *Id.*  And in language that could have been written for this case: "Reading section 1668 to encompass intentional breaches of contract would erode fundamental distinctions between contract law, which is meant to enforce promises of individual parties, and tort law, which is meant to vindicate social policy."  *Id.*  That holding applies

3

with full force here because OJC does not allege—and has no evidence—that TT committed any independently tortious act while performing the contract.

Instead, what OJC alleges is that TT misrepresented its capabilities *before* the contract was formed—to induce contract formation—and then failed to perform *after*.  To be sure, the precontractual fraud is independently actionable as fraudulent inducement, and § 1668 fully protects that claim—none of the contract limitations apply to whatever fraud damages OJC can prove.  But the statute does not, for that reason, strip the same limitations from a separate contract-breach claim alleging that TT didn't do what it promised.  *See, e.g.*, *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.*, 209 Cal. App. 4th 1118, 1126 (2012) (voiding contract limitation on fraud claim but enforcing that limitation on breach of contract claim); *accord Darnaa, LLC v. Google LLC,* 756 F. App'x 674, 676 (9th Cir. 2018).  Thus, contrary to OJC's mistaken view, § 1668 "does not per se invalidate limitations on liability as applied to all claims in an action." *Peregrine Pharms., Inc. v. Clinical Supplies Mgmt., Inc.,* 2014 WL 3791567, at *8 (C.D. Cal. July 31, 2014).

OJC's contrary argument depends on treating the alleged fraud and the alleged breach as one continuous indivisible wrong.  That is not California law, as *NECF* made clear.  "Contract law exists to enforce legally binding agreements between parties; tort law is designed to vindicate social policy." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994).  "Conduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law." *Id.*  A party may breach a contract and commit an independent

tort at the same time—*see, e.g.*, *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 19–20 (2024); *Erlich v. Menezes*, 21 Cal. 4th 543, 551 (1999)—but each wrong is still answered by its own rules.  Thus, "an omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty."  *Rattagan*, 17 Cal. 5th at 19.

Consider one of the main cases that OJC cites for the opposite conclusion.  *See Civic Ctr. Drive Apartments Ltd. v. Sw. Bell Video Servs.*, 295 F. Supp. 2d 1091 (N.D. Cal. 2003).  There, a cable installer breached a cable-installation agreement by laying non-compliant cabling.  When it discovered that the cable it had laid didn't meet safety standards, it concealed that fact for seven months while the building owner continued construction around the faulty cables.  The initial breach was material contract nonperformance; the later concealment was fraud.  Thus, the cable installer couldn't rely on the consequential-damages exclusion in the contract to avoid paying for the distinct damages (the cost of replacing the bad cable with safe cable) caused by the distinct wrong—the concealment.  *See id.* at 1106.  If it could do that, then enforcing the contract limitation would exempt the installer from responsibility for fraudulent concealment—which is what § 1668 proscribes.

OJC's case presents the opposite situation.  The alleged fraud here—misrepresenting TT's warehousing and logistics capabilities—happened entirely before the contract existed.  Once the contract was executed, TT still had a separate obligation to perform as promised—even if those promises were false or misleading.  And OJC appears to have plenty of evidence that TT didn't perform as promised.  But if it had performed, OJC wouldn't have been harmed (even if TT had lied at the start) because, the

theory goes, nothing else could have caused its marketplace accounts to be suspended—and it would have continued to sell unabated for millions in net profits through unfettered accounts.  Nothing in that theory, though, contends that TT committed any independently actionable fraud during contract (non)performance.

To be sure, the alleged precontractual fraud and the contract breach shared common subject matter (TT's services capabilities) and—by the inevitable sequence of events—combined to cause the same cascade of disappointments: mistaken, missed, or late shipments; then, third-party account suspensions; then, lost future sales.  But the fraud and the breach are still two discrete wrongs—a false promise and a broken promise.  *See, e.g., Integrated Energy, LLC v. Siemens Gov't Techs., Inc.*, 2017 WL 10562969, at *5 (C.D. Cal. May 19, 2017) (enforcing limitation on contract and implied-covenant claims; distinguishing *Civic Center Drive* because it involved "fraudulent concealment" of "faulty performance").  None of the other cases OJC catalogues changes that reality.

In each case superficially resembling this one (like *Civic Center Drive* discussed above), § 1668 reached independently wrongful conduct—*during* contract performance not *before* contract formation—that went beyond mere failure to do what the contract required.  *See, e.g., Chrisman v. Promote Mexico LLC*, 2021 WL 4442416, at *5 (C.D. Cal. July 12, 2021) ("[S]ection 1668 applies to contract claims based on fraudulent conduct."); *Peregrine Pharms.*, 2014 WL 3791567, at *8 (enforcing limitations on claims for breach of contract, passive negligence, and negligence per se but striking them as to fraud claims); *Gerber v. Twitter, Inc.*, 2024 WL 5173313, at *8 (N.D. Cal. Dec. 18, 2024) (Twitter's knowing refusal to

remediate API security vulnerabilities was separate "intentional conduct" during contract performance); *Isgur v. Meta Platforms, Inc.*, 2026 WL 194640, at *6 (N.D. Cal. Jan. 26, 2026) (suggesting that Meta's deliberate layoff of customer service employees "intentional conduct" brings § 1668 into play such that complaint "by-and-large would survive" the contract limit at pleading stage); *Stemcell Techs. Canada, Inc. v. StemExpress, LLC*, 2022 WL 17546776, at *3 (N.D. Cal. Dec. 9, 2022) (defendant's "breach of contract claims arguably sound in fraud").[2]

By contrast, where the fraud precedes the contract and the breach is ordinary (even if intentional) nonperformance, enforcing contract limitations for the breach of contract is de rigueur in California—it is not exempting anyone from the fraudulent inducement. It is doing exactly what limitations of liability are supposed to do—and what they were negotiated for: capping or limiting the consequences (direct or indirect) of a party's failure to perform as promised. So too here. *See*, *e.g.*, *Food Safety Net Servs.*, 209 Cal. App. 4th at 1126 (in fraudulent inducement case also involving breach-of-contract claim, held that contract limitations, unless unconscionable, applied "to claims for breach of contract" even if "ineffective with respect to claims for fraud and misrepresentation"). Citing *Food Safety* with approval, the California Supreme Court in *NECF* rejected in every material way OJC's theory that the mere presence of a parallel

---

[2] OJC's remaining cited cases are either inapt, *see May v. Google LLC*, 2026 WL 788376, at *11–12 (N.D. Cal. Mar. 20, 2026) (addressing different provision of § 1668 applied to conversion claim), or just incorrect about California law. *See Claredi Corp. v. SeeBeyond Tech. Corp.*, 2010 WL 1257946, at *6–7 (E.D. Mo. Mar. 26, 2010) (predating *NECF* by 15 years); *Starbrands Cap. LLC v. Original MW Inc.*, 2015 WL 5305215 (D. Mass. 2015) (predating *NECF* by 10 years).

fraud claim dissolves the limitation of liability for a contract claim. *See* 17 Cal. 5th at 714.

And for good reason: If § 1668 voided contractual liability limitations on breach-of-contract claims whenever the plaintiff also alleged that the contract was fraudulently induced, then every negotiated liability cap in California could be undone by the addition of a promissory fraud claim. Any contractor who overpromised its capabilities and then underdelivered—which is to say, a great many breach-of-contract cases— would find its carefully negotiated risk allocation voided as a matter of law. The sophisticated commercial parties who bargain for consequential-damages exclusions would discover that they had bargained for nothing, because any allegation that the other side misrepresented its ability to perform would sweep the exclusion away. Whatever good policy might be served by such a rule, that is not California law. So § 1668 voids the consequential-damages bar here for OJC's fraud claim only, not for its contract claim. OJC cannot have it both ways—affirming the contract to preserve its breach claim while voiding the contract's limitations to preserve that claim's damages.

### B. OJC's Lost Future Profits are Consequential Damages Caused by Breach of Contract—Not Reliance Damages Proximately Caused by Fraud in the Inducement.

If the consequential-damages exclusion in its contract with TT holds, OJC maintains that its claimed millions in lost future profits should then be reimagined not as typical consequential damages caused by breach of contract, but as a special damages category of "reliance-based lost profits" caused by fraudulent procurement of the contract. (ECF 221 at 5–8). But

that argument is based on multiple layers of category errors, trades on manufactured ambiguities in California law, and mistakes but-for causation with proximate causation.

Begin with what OJC says it lost and how it describes the loss. OJC seeks "the profits OJC would have earned but for reliance on [TT's] fraudulent representations in entering the contract"—i.e., the future sales it says it lost when online marketplace accounts were suspended and its broader business collapsed. (ECF 221 at 8). By OJC's own formulation, this is the profit it expected to earn had TT done what it promised. The question is whether that kind of loss—profits measured against a world in which the contract was fully performed—can be recovered as a fraud damage rather than a contract damage. California law is clear about the answer: no. And that answer follows unavoidably from the hornbook difference between contract and tort damages.

Contract damages protect a party's expectation interest—its "interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed." Restatement (Second) of Contracts § 344(a) (1981). Fraud damages, by contrast, protect a party's reliance interest—its "interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made." *Id*. § 344(b). The difference is the baseline: an expectation measure looks forward to a world where the promise was kept, but a reliance measure looks backward to a world where the promise was never made. That is why fraud damages are "directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction," *Stout v. Turney*, 22 Cal. 3d 718, 725 (1978), and

why the benefit of the bargain is ordinarily unavailable in a fraud action, *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995).[3]

The California Supreme Court enforced this precise line in *Lazar v. Superior Court*, 12 Cal. 4th 631 (1996). A worker was recruited from New York to California based on false promises about the job. When the employer later fired him, the worker sued for both breach of contract and fraud. The court separated the two claims' damages. For fraud, the worker could recover "the costs of uprooting his family, expenses incurred in relocation, and the loss of security and income associated with his former employment in New York"—costs he incurred or income he gave up by entering the transaction. *Id.* at 648–49. But for "any loss of income allegedly caused by wrongful termination of his employment," the worker had to "rely on his contract claim." *Id.* at 649. The income he expected from the new job was an expectation loss; the income he surrendered from the old job was a reliance loss. Both were real—but only one was recoverable in tort.

Here, OJC admits it paid nothing—and lost nothing—in reliance on TT's alleged fraudulent promises. (ECF 208 at 3; ECF 210 at 6–7 n.3). It has identified no alternative warehousing arrangement it abandoned to sign on with TT instead, no competing contract it walked away from because it believed TT, no opportunity it surrendered in detrimental reliance on TT's precontractual representations. What OJC has identified instead is the profit it expected to earn had TT shipped its orders correctly and kept its

---

[3] The possible exception to this rule is between fiduciaries. *See Stout*, 22 Cal. 3d at 725–26. But that exception wouldn't apply here since the parties are not in a fiduciary relationship.

marketplace accounts in good standing.  That is the mirror image of *Lazar*'s new-job income—it is the expected return on the promise, not the sunk cost of entering it.

*Orozco v. WPV San Jose, LLC*, 36 Cal. App. 5th 375 (2019), which OJC cites prominently, exemplifies the distinction rather than undermines it.  In *Orozco*, a commercial landlord promised a restaurant tenant—outside the lease—that no competing restaurants were being considered for the same shopping center.  That turned out to be false.  A competing restaurant moved in, and the tenant lost business.  The court allowed recovery of profits lost to the competing restaurant as fraud damages.  *See id.* at 400–01.  After all, the loss flowed from the falsity of the misrepresentation: a competitor arrived, just as the landlord had said would *not* happen.  The lost profits were thus fraud reliance damages because the tenant's injury tracked the truth or falsity of the representation, not anything to do with the landlord's contractual performance on the lease.

OJC's case is the structural opposite.  TT's misrepresentation concerned its own ability to perform the contract.  The losses OJC suffered—missed shipments, marketplace suspensions, collapsed sales—flowed from TT's failure to perform, not from the falsity of TT's capability representations as such.  *See, e.g., Serv. by Medallion, Inc. v. Clorox Co.*, 44 Cal. App. 4th 1807, 1819 (1996) (holding that third-party customer cancellations "cannot be the product of . . . reliance on [the defendant's] misrepresentation" when cancellations "resulted not from [the defendant's] misstatements, but from 'its failure to honor its representations'"—which "is an assertion of breach of contract damages, not reliance damages").  If

TT had the capabilities it claimed but performed poorly anyway, OJC's losses would be identical.  If TT lacked the capabilities but nonetheless performed flawlessly, OJC's losses would be zero.  With the fraud held constant, the variable is always performance.  The truth or falsity of TT's pre-contractual statements is, in this sense, beside the point.  That is why "if the defrauded plaintiff would have suffered the alleged damage even in the absence of the fraudulent inducement, causation *cannot* be alleged and a fraud cause of action cannot be sustained."  *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1064 (2012); *accord Orcilla v. Big Sur, Inc.*, 244 Cal. App. 4th 982, 1008 (2016).  The California Supreme Court cannot be any clearer about this causation rule.

In *Gray v. Don Miller & Assocs, Inc.*, 35 Cal. 3d 498 (1984), for instance, the court reversed a fraud damages award because the plaintiff's loss "was not caused by [the] misrepresentation, but by the sellers' refusal to accept his offer of sale."  *Id*. at 504.  And more recently, in *Simon v. San Paolo U.S. Holding Co.*, 35 Cal. 4th 1159 (2005), the court recognized that fraudulent promises "may cause the [plaintiff] to expend money in reliance, but they do not themselves cause the losses occasioned by the [plaintiff's] failure to actually obtain" the benefit of the bargain; that injury "is instead caused by the . . . breach of an enforceable contractual obligation."  *Id*. at 1176.  In each case, the loss tracked performance (or the failure to sell), not the content of the misrepresentation.  OJC's attempt to distinguish *Simon* on the ground that OJC seeks lost profits from future "independent business activity" rather than just from profits lost on existing orders mishandled by TT (ECF 221 at 9 n.1) is just a description of OJC's pivot— not a reason distinguishing this case in any legally relevant way from

12

*Simon*.  Besides, that reclassification only redescribes another expectation loss: OJC could only have earned the future marketplace profits it expected to earn from unsuspended online platforms if TT performed as promised with existing orders—so that its online accounts wouldn't get suspended.

None of the other cases cited by OJC disturbs this settled understanding of California law.  Its reliance on *Rattagan* and *Erlich*, for instance, doesn't help.  Those cases establish that one act may breach a contract and commit a tort, so that a plaintiff may "recover under both theories." *Rattagan*, 17 Cal. 5th at 24; *Erlich*, 21 Cal. 4th at 551.  But recovery under both theories still requires an independent tort whose damages are measured by tort's own rules; it does not make the same damages available on both claims.  That is why the bar to double recovery for the same injury exists. *See Tavaglione v. Billings*, 4 Cal. 4th 1150, 1159 (1993).  OJC has an independent tort—fraud in the inducement—and it may pursue it.  But the measure of that tort's damages is detrimental reliance, and OJC's claimed $6 million is not a reliance figure.[4]

-------

[4] That conclusion is not undermined by *Grouse River Outfitters Ltd. v. Oracle Corp.*, 2019 WL 8918902, at *11 (N.D. Cal. 2019), which said only that if the defendant there "failed to perform under the Agreements, [plaintiff] might have a claim for at least some damages for fraudulent inducement." *Id.*  But that is at best conditional dictum that identifies no measure of damages.  Besides, the *Grouse River* court cited *Medallion* for the very proposition that only reliance expenditures—not expectation profits—might be recoverable in such circumstances. *See id.* ("If the contract had not been performed, we might agree that [reliance] expenditures constituted damages proximately caused by the misrepresentations.") (citing *Medallion*, 44 Cal. App. 4th at 1818).  Likewise, *West Pacific Electric Co. v. Dragados/Flatiron Joint Venture*, 534 F. Supp. 3d 1209 (E.D. Cal. 2021), cannot bear the weight OJC places on it.  There, a subcontractor alleged that a general contractor concealed material information about their project and sought lost profits under both fraud and breach-of-contract theories.  When the general contractor moved for summary judgment on the fraud claim based in part on the economic-loss rule, the court denied summary judgment on that basis, *id.* at 1255—incidentally, just as

Indeed, OJC's seemingly strongest case only reinforces why it cannot win.  In *City Sols., Inc. v. Clear Channel Comms., Inc.*, 365 F.3d 835 (9th Cir. 2004), a company claimed it lost $9 million in profits because its bidding partner falsely promised to submit a joint bid for a telecommunications contract.  The district court allowed the lost-profits claim to go to the jury, but the Ninth Circuit reversed.  *Id.* at 840–42.  As relevant here, though, the reversed error was not any notion that lost profits can *never* be fraud damages—to the contrary, they can be when they flow from detrimental reliance.  The error causing reversal was that City Solutions had proved no connection between its reliance on the false promise and the loss it claimed.  *See City Sols., Inc. v. Clear Channel Comms., Inc.*, 242 F. Supp. 2d 720, 733–34 (N.D. Cal. 2003).  It never showed, for instance, that a different bidding partner would have won the contract.  *Id.*  The $9 million was simply what City Solutions had hoped to earn if the joint bid succeeded—the return on a promise kept, not the cost of a (false) promise believed.  OJC's claimed loss has the same structure: it is what OJC (like City Solutions) hoped to earn if TT performed as promised, and (like City Solutions) OJC identified no other detrimental reliance loss—like an alternative arrangement it would have pursued but for TT's alleged false representations.

---

this Court denied TT's earlier summary judgment motion asserting the same argument. (ECF 100).  But whether OJC's fraud claim survives the economic-loss rule tells us nothing about whether the claim has any compensable reliance damages.  Otherwise, the fraud claim in that case survived summary judgment only in the face of defendant's claim that the lost-profits evidence was too speculative to go to a jury.  *West Pacific*, 534 F. Supp. 3d at 1259.  They never reached the question here: whether those profits were measured from the reliance baseline or the expectation baseline.

OJC's only "reliance" counterfactual—that it would not have agreed to the contract liability limitations had it known TT lacked the capabilities TT claimed (ECF 221 at 3)—is just an axiomatic description of its regrets.  And while it is understandable as a grievance, it does not change the legal analysis about detrimental reliance.  When a plaintiff's lost profits flow from a falsehood—a landlord's promise about other tenants in *Orozco*, or a recruiter's implicit assurance about the old job left behind in *Lazar*—those profits are reliance damages, because the loss tracks the truth or falsity of the statement, not whether anyone performed a contractual obligation.  But when the profits the plaintiff claims are the ones it expected to earn from the defendant's performance of the very contract the fraud induced, like the customer revenue in *Medallion*, the telecommunications contract in *City Solutions*, the property purchase in *Simon*—and the millions in future lost sales here—those profits are expectation damages.  They belong to the contract-breach claim—and they are measured by the promise kept, not by any position surrendered.  No relabeling of the damages description changes that.

Finally, three of OJC's subsidiary arguments deserve brief responses, because each takes a true proposition and misapplies it, makes other category errors, or further distorts established causation principles.

*First*, OJC argues that its lost profits are "not benefit-of-the-bargain damages" and therefore must be something else—specifically, reliance damages recoverable in tort.  (ECF 221 at 7–8).  That argument trades on an invented ambiguity in California Civil Code § 3343, which applies in property-transaction fraud and measures the difference between the value as represented and the value as received.  OJC may be right that its claimed

lost profits are not computed using the § 3343 benefit-of-the-bargain formula.  But a profit measured by a world in which the promise was performed is an expectation loss whether or not § 3343 is the vehicle used to compute it.  Consequential contract damages—lost profits from downstream transactions that would have occurred had the contract been performed—are not something other than the benefit of the bargain.  They are one of the two ways of measuring it.  *See* Restatement (Second) of Contracts § 347(a)–(b); *see also Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 968 (2004) ("Contractual damages are of two types—general damages (sometimes called direct damages) and special damages (sometimes called consequential damages)."); *College Hosp. Inc. v. Superior Court*, 8 Cal. 4th 704, 712 (1994) (general and special damages are both "designed to make the plaintiff 'whole'").  Moving a loss from the "direct" column to the "consequential" column changes its remoteness within contract law.  But it does not convert a contract loss into a tort loss.

*Second*, OJC argues that because California Civil Code § 3333, the general tort recovery statute that applies to fraud in services, authorizes recovery of "all the detriment proximately caused" by the tort "whether it could have been anticipated or not," its marketplace-suspension losses are recoverable as a foreseeable consequence of TT's misrepresentations.  (ECF 221 at 5).  That is correct as a description of what § 3333 does—it removes the foreseeability ceiling that California Civil Code § 3300 otherwise imposes on contract damages.  But removing the foreseeability ceiling does not change the baseline from which damages are measured.  Section 3333 broadens the scope of fraud damages; it does not redefine them.  A loss that

16

is measured from the expectation baseline remains an expectation loss even if § 3333's foreseeability rule would not have barred it.  The question here is not whether OJC's marketplace-suspension losses were foreseeable; it is whether they were caused by reliance on a misrepresentation or by nonperformance of a contractual obligation.  Section 3333 does not answer that question, and OJC cites no authority suggesting that it can.

*Third*, OJC argues that TT's failure to perform is not a superseding cause that breaks the causal chain from fraud to loss, and that the chain of causation thus runs unbroken from the misrepresentations through OJC's reliance on them to the claimed $6 million in damages.  (ECF 221 at 9–10).  True enough: failure to perform is a legally foreseeable outcome of lying about ability to perform—and the general superseding-cause tort rules, *see, e.g.*, *Ash v. North Am. Title Co.*, 223 Cal. App. 4th 1258, 1274 (2014), would not dictate a different conclusion.  So if the Court's use of the phrase "independent intervening act" in its prior order suggested any other rule-statement, that suggestion is disavowed here.  But the dispositive point there was, and remains, the character of the loss—not the mechanics of the causal chain.  Even granting everything OJC says about causation in this situation, it still does not follow that the claimed damage is a reliance loss rather than an expectation loss.  Proximate causation and damages measures are different legal concepts: a plaintiff may prove an unbroken causal chain from a fraud to a loss and still not have shown that the loss is measured from the reliance baseline rather than the expectation baseline.  As was the case in *Simon* and *Gray*, where the assignment of loss turned not on whether the causal chain was broken but on which duty was violated and which interest—expectation or reliance—was injured, so it is here.

17

* * *

In sum, the findings and conclusions in the Court's summary adjudication order stand.  OJC's marketplace-suspension losses are recoverable, if at all, only as contract damages—but they cannot be recovered here for TT's alleged breach of contract because they are still classic consequential damages barred by the enforceable contractual limitation of liability that OJC agreed to.  And while that same contractual limitation may not apply to OJC's fraudulent-inducement claim as such, that does not permit OJC to recover the same claimed contract-expectation loss by just recharacterizing them as fraud reliance damages.  That is a definition shell-game.  For all these reasons, OJC's request to reconsider in part the Court's summary adjudication order is denied.  Partial summary judgment remains granted in TT's favor on OJC's fraud claim.

IT IS SO ORDERED.


Dated: July 17, 2026

_____
STEVE KIM
United States Magistrate Judge